APPEAL NO. ____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

Ohio Democratic Party,
*Plaintiff-Appellee*,

v.

Ohio Republican Party; Donald J. Trump for President, Inc.; Roger J. Stone Jr.;
and Stop the Steal, Inc.

*Defendants-Appellants*.

_____

On Appeal from the United States District Court
For the Northern District of Ohio Eastern Division
Case No. 1:16-cv-2645
Judge James S. Gwin

_____

**EMERGENCY MOTION FOR STAY ON BEHALF OF DEFENDANT-
APPELLANT DONALD J. TRUMP FOR PRESIDENT, INC.**

**ACTION REQUIRED BY MONDAY, NOVEMBER 7, 2016**

_____

Chad A. Readler
JONES DAY
325 John H. McConnell Blvd., Ste. 600
Columbus, Ohio 43215
(614) 469-3939

*Counsel for Appellant
Donald J. Trump for President, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant Donald J. Trump for President, Inc. state as follows:

Donald J. Trump for President, Inc. is not a parent, subsidiary or other affiliate of a publicly owned corporation, nor does a publicly owned corporation have any interest in Donald J. Trump for President, Inc.

Appellant Donald J. Trump for President, Inc. hereby moves under Federal Rules of Appellate Procedure 8 and 27, and Circuit Rule 27(c), for an emergency stay of the district court's order, which threatens the Campaign with imminent harm, including the loss of core First Amendment protections.

## INTRODUCTION

On an evidentiary record consisting of quotes from speeches by national political candidates and a confirmation by Plaintiff the Ohio Democratic Party that no acts of voter intimidation have taken place this election season in Ohio, the district court granted Plaintiff's emergency request that Donald J. Trump for President, Inc. (the "Campaign") and its supporters be enjoined from a sweeping range of ill-defined conduct in the final days of the 2016 Presidential election.  That conduct includes—*"but [is] not limited to"*—a seven-part list that ranges from "describing" (to apparently anyone at any time) "the penalties under any Ohio or Federal statute for impermissibly casting a ballot," to "taking photos" of any "voters" (apparently including one's friends or a selfie) "around a polling place," to "delaying a voter . . . from reaching the . . . polling place," whether the delay seemingly was caused by attempting to hand them campaign literature or an accident on the highway.  Opinion & Order ("Order") at ¶¶ a, d, f, Dkt. 27 (Exhibit 1).

For good measure, the district court then applied its sweeping order to "other individuals and groups, including groups associated with the Clinton for Presiden-

cy campaign." *Id.* at 2-3.  And it did all of this gutting of the First Amendment without even indicating the statute it was relying on to support it.

This Order not only federalizes Ohio law (which already prohibited voter intimidation)—it literally imposes a comprehensive election code the court will apparently continue to invent on the fly.  And it imposes that evolving federal code on seemingly every Ohioan, not just the parties before the court below.  Left to stand, that Order irreparably harms the Campaign as well as any unsuspecting citizen who falls in the district court's crosshairs.  It should be stayed immediately.

*     *     *     *     *

First, the facts.  Plaintiff's allegations were grave:  the Trump campaign purportedly conspired with a host of others to illicitly suppress voter participation. And its request for relief was remarkable:  an extraordinary, last-minute intervention in the presidential election.  But the evidence offered to justify the request was scant:  a handful of statements by a presidential candidate making his pitch to voters.  Absent from the record was any evidence of voter intimidation in Ohio in 2016.  David Pepper, the Chairman of the Ohio Democratic Party, admitted that he had "not learned of any cases of voter intimidation" anywhere in Ohio.  Dkt. 20-1, ¶2.[1]  That, even after three weeks of early in-person voting, where hundreds of

---

[1] Pursuant to 6th Cir. R. 27(c)(2), the substantive filings in the district court are attached as Exhibit 4.

3

thousands of Ohioans voted, all in the presence of duly-appointed Republican poll observers—the Campaign's alleged co-conspirators.

The absence of such evidence is no surprise. All of the Campaign's authorized poll watchers are trained on how they must comport themselves while serving in that role. Training materials explain that it is "critical" each poll watcher "maintain a professional, courteous demeanor at all times and absolutely never do anything to disrupt or interfere with the voting process." (Dkt. 26-1 at 1 (emphasis original).) The materials even warn that "any behavior" contrary to these instructions "will not be tolerated under any circumstances." (*Id.*) In the end, the evidentiary record consisted primarily of empty rhetoric designed to score political points rather than actual misconduct justifying a statewide restraint on political speech.

Next, the law. Despite requiring that seemingly every Ohioan follow a series of rules imposed by the court—some of which will apparently be written after-the-fact—the court does not actually find any actual or imminent violation of any statute. None. It simply recites two statutes (gratuitously labeling one of them, the Enforcement Act of 1871, 42 U.S.C. § 1985, as the "KKK Act"), quotes a few statements by Donald Trump at rallies outside Ohio, and a *Boston Globe* article quoting an unnamed voter about his supposed plans. That smattering of statements is not enough to justify *any* relief under *any* statute, let alone the sweeping relief

the district court ordered under the venerable civil rights laws Plaintiff's have deployed in this transparently political exercise.

Even worse, the order tramples upon core First Amendment freedoms. It imposes vague prohibitions against poorly defined categories of core political activity—talking to voters, giving information to voters, etc.—that guarantee hundreds (if not thousands) of Ohioans will be chilled from participating in our democratic process. One example illustrates the point. The order prohibits anyone from having a truthful discussion about voting rules with another voter when the two are heading inside to vote. Order at 3. Such a prohibition clearly violates the First Amendment.

Further troubling is the fact the court flexed its federal muscle against the backdrop of an extensive array of Ohio voting rules, including express prohibitions on voter coercion.[2] In some respects, the court seems to have exceeded Ohio law in the range of political speech it restricts. But in many other respects, the court merely "ordered compliance with . . . the Ohio Revised Code." Order at 2. In that

---

[2] *See, e.g.,* Ohio Rev. Code 3599.01(A)(2) (Bribery) ("No person shall before, during, or after any primary, convention, or election . . . [a]ttempt by intimidation, coercion, or other unlawful means to induce such delegate or elector to register or refrain from registering or to vote or refrain from voting at a primary, convention, or election for a particular person, question, or issue."); Ohio Rev. Code 3599.24(A)(5) (Interference with conduct of election) ("No person shall do any of the following: . . . [l]oiter in or about a registration or polling place during registration or the casting and counting of ballots so as to hinder, delay, or interfere with the conduct of the registration or election.").

sense, the Order essentially federalizes Ohio voting laws, usurping state court jurisdiction over previously state-regulated conduct.  The Order also thus violates the well-established principle that injunctions cannot issue merely to order parties to "obey the law."  *See E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984).  Believing that this settled rule applies only to "hypergeneralized orders to indefinitely abide by broad legal commands," Order at 2, the court distinguished today's relief as ordering "compliance with specific provisions of the Ohio Revised Code," apparently exempting this "follow Ohio law" order from the reach of precedent barring other orders of the same ilk.

If the court's Order appears puzzling to this Court, think of how it must appear to everyday Ohioans, none of whom were parties to the case, but all of whom are covered by the Order.  To be sure, the Order outlaws "voter intimidation activity."  *Id.* at 3.  But what specifically are Ohioans barred from doing with respect to voting?  The untailored list of examples of such activity in the order offers more confusion than clarity.  And compounding matters, the Order also prohibits "activity including but not limited to" the activity articulated in the Order.  *Id.* at 3.  So who could fault a voter who claims to be confused by this judicial proclamation? The order, after all, expressly refuses to say what it proscribes.

All the more troubling is the core conduct the Order seeks to regulate:  political organizing, political volunteerism, and political speech.  Viewed in this light, it

should be unsurprising that other state Democratic parties have failed to secure re-lief in the exact same setting,  Today's case is one of six cookie-cutter lawsuits in-volving the same allegations filed in political "swing states" (Arizona, Michigan, Nevada, North Carolina, and Pennsylvania, along with Ohio) by the resident Dem-ocratic state party.  In the other two cases that have reached resolution, the courts there denied the plaintiffs relief.  In Nevada, Judge Boulware, after holding three separate evidentiary hearings on plaintiff's TRO request, denied relief in full.  *See* http://electionlawblog.org/?p=88780. (*Nevada State Democratic Party v. Nevada Republican Party*, No. 2:16-cv-02514 (Nov. 4, 2016) (order to be submitted when publicly available).  Likewise, in Arizona, Judge Tuchi denied plaintiff's TRO re-quest in a 25-page written order after an evidentiary hearing, concluding that plain-tiff failed to show a likelihood of success on the same two claims raised in this ac-tion.  *See* Order, *Arizona Democratic Party v. Arizona Republican Party*, No. 16-cv-03752 (Nov. 4, 2016) (Exhibit 3).  Judge Tuchi explained that plaintiff "has not demonstrated it is likely to succeed in showing the statements and actions of De-fendants to-date constitute intimidation, threat, coercion or force against voters for voting or attempting to vote in violation of" the relevant statutes.  *Id*. at 24.

The result should be no different here.  As this Court recently explained, "[w]hen an election is 'imminen[t]' and when there is 'inadequate time to resolve [] factual disputes' and legal disputes, courts will generally decline to grant an injunc-

tion to alter a State's established election procedures." *Crookston v. Johnson*, — F.3d —, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016). In view of the empty record on which it acted, the district court plainly disregarded this instruction. Accordingly, the Court should stay the district court's order, leaving the election to the voters and well-worn, effective state legal rules, rather than routing that entire process in the federal courts.

## BACKGROUND

This suit was filed on October 30, 2016, days before the 2016 general election. The complaint sought relief under Section 11(b) of the Voting Rights Act ("VRA") and 42 U.S.C. § 1985(3), alleging that the Campaign and the Ohio Republican Party, along with their supporters and others, were engaged in a massive conspiracy to intimidate voters.

There was, however, no evidence to support these allegations. In its district-court filings, Plaintiff offered nothing more than opaque remarks in public speeches by political candidates. They included general references to campaign volunteers "watching" polling places, Complt., Dkt. 1, ¶¶21–24, encouragement to supporters to "be involved" in the campaign, *id.* ¶28, invitations to supporters to participate in the election to ensure it is not "stolen," *id.* ¶27, and questions regarding the possibility of election fraud, *id.* On its face, none of this amounts to express direction that Ohioans engage in forms of "voter suppression," let alone "vigilan-

tism," *id.* ¶¶ 45–46, 65—an inflammatory characterization that serves only to invoke heated reactions by those on all sides of the political arena.

Even at the November 4 hearing on Plaintiff's TRO request, Plaintiff still failed to produce *any* evidence of intimidation. In fact, its Chairman admitted that he had not heard of a *single instance* of voter intimidation in Ohio, even though voting has been underway now for over three weeks and hundreds of thousands of Ohioans have already cast their ballots in-person at voting centers that mirror Election-Day voting precincts. Pepper Decl., Dkt. 20-1, ¶2. Nor could State Representative Stephanie Howse, Plaintiff's other witness, cite any voter intimidation in Ohio in 2016. She did testify to seeing an anonymous billboard posting in her minority-majority House district indicating that "voter fraud is a crime." Even assuming one could infer unlawful "voter intimidation" from the public posting of a factual political message, the billboard was in place only a short while, and *only in 2012*. Obviously, the signage has no affiliation to the Trump 2016 campaign. Nor, seemingly, did it have any suppressive effect: Representative Howse testified that African-American voter turnout in her district was "higher than normal" in 2012.

Nevertheless, the district court granted Plaintiff a temporary restraining order directed at the campaigns of both major political parties. It prohibits both campaigns from "engaging in voter intimidation activity," but did not exhaustively define what that entailed. Order at 3. Instead, it indicated that such activity

"includ[ed] but [was] not limited to" a list of prohibited conduct. *Id.* Among this list was a prohibition on "distributing literature and/or stating to individuals" anywhere near a polling place "that voter fraud is a crime, or describing the penalties under any Ohio of Federal statute for impermissibly casting a ballot, or training, organizing, or directing individuals to do the same." *Id.* Because the order open-endedly applies to "other individuals or group" without qualification, it presumably covers every person in Ohio. The Campaign promptly appealed this order. Notice of Appeal, Dkt. 29 (Exhibit 2).

The election is three days away. Because the Campaign will suffer irreparable harm absent relief during that timeframe, this case qualifies for emergency treatment under Circuit Rule 27(c). Further, because the district court already concluded (erroneously) that Plaintiff satisfied the standards for a temporary restraining order, and time is short, requesting a stay in the district court first would be futile and would unnecessarily delay the timely consideration of the district court's decision here. The Campaign thus did not move for a stay in the district court, but has properly sought such relief in the first instance in this Court. *See* FED. R. APP. P. 8(a)(2) (permitting application for stay in court of appeals if "moving first in the district court would be impracticable"); *accord Ohio v. Roberts*, 448 U.S. 56, 74 (1980) ("The law does not require the doing of a futile act.").

**ARGUMENT**

In deciding whether to stay a temporary restraining order, this Court applies "the same factors considered in determining whether to issue a TRO or preliminary injunction." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (quoting *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). There are four such factors: (1) whether the movant is likely to succeed on the merits, (2) whether the movant would suffer irreparable injury without a stay, (3) whether a stay would cause substantial harm to others, and (4) whether a stay would serve the public interest. *Id*. The Campaign meets each one of these.

## I. The Campaign Is Likely To Prevail On The Merits Of Its Appeal Challenging The Temporary Restraining Order.

The district court entered a sweeping order prohibiting speech-related conduct fully knowable only to the judge who issued it. And in doing so, the district court did not even *attempt* to root its decision in any statutory mandate. The court acknowledged that Plaintiff had asserted two claims—under Section 11(b) of the VRA and 42 U.S.C. § 1985(3)—but the court never found that (in the language of the relevant TRO test) Plaintiff was likely to succeed on either one of them.

Nor could it. Both of Plaintiff's claims underlying the request for emergency relief rested upon an alleged conspiracy among the Campaign, its supporters, and others to "threaten, intimidate, and thereby prevent" voters from voting in the

2016 election.  Complt. ¶1.  But there is no evidence—none at all—in Plaintiff's lower-court filings or hearing evidence that such misconduct is occurring or even likely to occur between now and Election Day.  This alone should have precluded entry of the district court's order.

### A. Plaintiff presented no evidence of threats or intimidation, let alone any attributable to the Campaign.

The principal source of Plaintiff's "evidence" was campaign speeches by the Republican Presidential and Vice-Presidential candidates.  Setting aside the fact that these speeches by and large were not given in Ohio, did not refer to Ohio, and did not urge any specific conduct in Ohio, nothing in those speeches suggests that anyone in Ohio stands to suffer if the district court's order is stayed.  Some of the comments in the speeches relate to policy positions.  *See, e.g.*, Mot. for TRO, Dkt. 8, at 3 (noting the Campaign's concern with, and opposition to, voter fraud).  Some relate to fears of election tampering, *e.g.*, *id.* at 4 ("[T]he only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on.")—a notion that enters the political vernacular (and process on occasion) every election season.  *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J.) (explaining that states have a valid interest "in deterring and detecting voter fraud"); *cf.* Tim Dickinson, *Ohio 2004: The Howard Dean Interview*, Rolling Stone,  http://www.rollingstone.com/politics/news/ohio-2004-the-howard-dean-interview-20060605 (June 5, 2006) ("[Howard Dean:] I'm not confident that the

election in Ohio was fairly decided. . . . We couldn't say one way or another if the election was stolen. . . . [T]he machines were not reliable").  Others are designed to implore voters to turn out, and to volunteer to help the Campaign.  Mot. for TRO at 7 ("Governor Pence urged Trump supporters to sign up to be poll watchers to combat purported voter fraud, claiming that the media is trying to 'rig' this election 'with their biased coverage.'").  But none even suggests any intention on the Campaign's part to use force, threats, intimidation, or coercion to stop people from voting for the candidate of their choice.  In fact, much of Plaintiff's motion below was spent railing against the supposed wrongdoings of Roger Stone and his Stop The Steal group—neither of which has any connection whatever to the Campaign.

Plaintiff's other "evidence" was even more specious.  Plaintiff cited statements urging supporters to serve as "poll watchers," *id*. ¶30, also known as poll observers, a long-standing practice used by both parties and authorized by Ohio law.  *See* Ohio Rev. Code  3505.21 ("Appointment of challengers and witnesses").  It also invoked statements suggesting that some on the voting rolls are dead, Complt. ¶32, a fact recently confronted by the State of Ohio, *see A. Philip Randolph Inst. v. Husted*, —F.3d—, No. 16-3746, 2016 WL 5328160, at *1 (6th Cir. Sept. 23, 2016) (addressing purging of Ohio election rolls to remove "the names of the deceased" as well as those "voters who are no longer eligible to vote"); Catherine Candisky, *Secretary of State Jon Husted sued over purge of voter rolls*,

COLUMBUS DISPATCH (Apr. 7, 2016), https://perma.cc/TV5Z-QS2Z ("In recent years, Husted's office has removed 465,000 deceased voters . . . from Ohio's voter rolls."). Plaintiff suggested a nefarious motive in the Campaign seeking volunteers in urban areas like Cleveland and Philadelphia, *see* Complt. ¶¶ 27, 51, 69, yet failed to acknowledge the obvious—that these are the largest cities with the largest concentration of voters in two states critical to the outcome of the Presidential election. And Plaintiff even worried about voters wearing "red shirts" to the polls on Election Day, Complt. ¶37, something Plaintiff should know is certain to happen in light of Ohioans' deep loyalties to the Indians, Buckeyes, and Reds.

Plaintiff also relied on an anonymous quote, supposedly made by an "unnamed official" to Bloomberg News, that the Campaign has "three major voter suppression operations under way." Mot. for TRO at 2–3, quoting Declaration of Donald J. McTigue, Esq., Ex. 17 (Joshua Green, Inside the Trump Bunker, with Days to Go, Bloomberg Businessweek (Oct. 27, 2016)) (Dkt. 8-3 at 140). The context of the story, however, reveals that this source (if she exists) was not referring to attempts to intimidate anyone from voting. Rather, she was referring to strategies to inform "three groups [Hillary] Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans," to "turn off" those voters and "undermine [Clinton's] appeal," making those constituencies less likely to "show[] up at the polls—particularly in Florida":

> Trump's campaign has devised another strategy … . Instead of ex-
> panding the electorate, [the Campaign] is trying to shrink it. "We have
> three major voter suppression operations under way," says a senior of-
> ficial. They're aimed at three groups Clinton needs to win overwhelm-
> ingly: idealistic white liberals, young women, and African Americans.
> Trump's invocation at the debate of Clinton's WikiLeaks emails and
> support for the TransPacific Partnership was designed to turn off
> Sanders supporters. The parade of women who say they were sexually
> assaulted by Bill Clinton and harassed or threatened by Hillary is
> meant to undermine her appeal to young women. And her 1996 sug-
> gestion that some African American males are "super predators" is the
> basis of a below the radar effort to discourage infrequent black voters
> from showing up at the polls—particularly in Florida.

McTigue Declaration, Ex. 17 at 6–7 (Dkt. 8-3 at 140).  The quote at issue, in other

words, addresses substantive advocacy—and it makes no reference to Election Day,

poll watchers, or anything of the sort.  If this is actionable "suppression," what po-

litical speech rights remain?  No doubt, the Ohio Democratic Party would rather

the public be barred from knowing any of this.  But the First Amendment provides

that its sole recourse is to engage in counterspeech, not to silence its opponents.

*See United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012).

Compare this thin record to that assembled in *Daschle v. Thune*, the lone

case Plaintiff cites to justify granting injunctive relief.  *See* Complt. ¶ 20 (citing

Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6

(D.S.D. Nov 2. 2004).  There, a TRO was issued only after the plaintiff presented

express evidence—including "[o]ral testimony" and "photographs," *id.* at 1—

revealing that individuals were "follow[ing] Native Americans from the polling

places," "copy[ing] [their] license plates," and recording "the license plates of Na-

tive Americans driving away for the polling places." *Id.* at 2.  Nothing similar—or even in the same ballpark—has been shown here.  Indeed, the district court acknowledged during the hearing below that today's case is "distinguishable."

Perhaps the best illustration of the weakness in Plaintiff's case is its reliance on stray remarks from Twitter and other places.  *See* Complt. ¶¶56–57.  This patchwork of hearsay comes from non-parties who are not controlled by, and have no discernible connection to, the Campaign.

In the end, Plaintiff's case rested on rhetoric, not evidence.  This deficiency is particularly surprising given that Plaintiff filed its motion knowing the burden it faces in this setting, as well as the extraordinary nature of the relief it seeks.  It is also telling.  Ohioans have been voting in-person for over three weeks at county voting centers, staffed just like a traditional precinct.  There has been more than enough time and opportunity for the harms threatened in the Complaint to materialize.  Yet nothing untoward has transpired, as Plaintiff's Chairman acknowledged.

## B.  The absence of evidence of threats or intimidation dooms Plaintiff's claims.

**1.** To prevail under Section 11(b) of the VRA, a plaintiff must prove "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote."  *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008); *see also Olagues v. Russoniello*,

16

770 F.2d 791, 804 (9th Cir. 1985); *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016). Claims under this provision are exceedingly difficult to establish. *See United States v. Brown*, 494 F. Supp. 2d 440, 477 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) (noting that the court "has found no case in which plaintiffs have prevailed under this section"); *Parson*, 157 F. Supp. 3d at 498–99 (finding no likelihood of success on the merits).

Unsurprisingly, Plaintiff failed to clear even the first hurdle. Its various allegations of "intimidation" are nothing more than legitimate exercises of free speech.

To start, many of Plaintiff's allegations focus on statements encouraging supporters to serve as "poll watchers." Complt. ¶30. But Ohio law expressly permits political parties to appoint poll observers to monitor the casting of ballots: "At any . . . election, any political party supporting candidates to be voted upon at such election . . . may appoint to the board of elections or to any of the precincts in the county or city one person, a qualified elector, who shall serve as observer for such party . . . during the casting of the ballots." R.C. 3505.21(B) (emphasis added). That is all the Campaign has done and will do as part of the upcoming election.

Balancing the need for honest and open elections with the desire for a safe, orderly process, the State requires parties to notify the board of elections of their

observer appointments eleven days before the election, *see* Complt. ¶68 (citing R.C. 3505.21(B)), and allows the parties to amend "at any time until four p.m. of the day before the election." R.C. 3505.21(C) (emphasis added). Once appointed, an observer "shall be permitted to be in and about the applicable polling place during the casting of the ballots and shall be permitted to watch every proceeding of the precinct election officials from the time of the opening until the closing of the polls." *Id.* Poll observers are also entitled to inspect the counting of ballots. *Id.* Recognizing the critical interest in keeping our political process fair and transparent, the statute requires all observers to swear an oath to "faithfully and impartially discharge the[ir] duties as an official observer," and mandates that "precinct election officials shall protect such observers in all of the rights and privileges granted to them by Title XXXV of the Revised Code." *Id.*

Measured against this statutory backdrop, Plaintiff's claim that the Campaign has "directed [its] supporters to engage in activity forbidden by Ohio state election law" by calling for supporters to serve as poll watchers (observers), Complt. ¶66, is an invitation to punish lawful, political conduct. (Though it is unclear from Plaintiff's complaint, it is worth noting that the parties, not the campaigns or the candidates, are responsible for appointing poll observers.) The State has enshrined poll observing as a means for ensuring trust in our election outcomes. Plaintiff provides no evidence that the Campaign has encouraged supporters to do

anything more than seek to exercise this statutory right (or engage in other protected activity outside polling places). *See id.* ¶30 ("Pence explained that any Trump supporter who has not volunteered to participate to provide 'accountability at a polling place' has not 'yet done all that you can do.'").

Plaintiffs next invoke the fear of nefarious "exit polling" conducted by the Campaign to intimidate voters. Exit polling, however, is a regular, harmless feature of the election-day process (primarily utilized by media outlets), and also an entirely proper exercise of First Amendment rights. *See ABC*, 479 F. Supp. 2d at 741, 744 (enjoining any effort to prohibit exit polling even within 100 feet of polling places). And at all events, the Campaign has no intention whatsoever of conducing such polls.

Plaintiff also connotes intimidation from the fact that some Ohio voters have offered to observe polling places in locations outside of their own community. *See, e.g.*, Complt. ¶56. In Ohio, however, political rights do not end at the county line. Rather, a party may appoint any qualified voter to observe the polls in any particular polling location in the state. R.C. 3505.21(B) (permitting appointment of any "qualified elector"); *compare* R.C. 3501.06(A) ("There shall be in each county of the state board of elections consisting of four qualified electors *of the county* . . . ." (emphasis added)). *See also* R.C. 3505.21(C) (directing party appointing observers to "notify the board of elections of . . . the precincts at which they shall serve").

Finally, Plaintiff imputes nebulous unlawful connotations to the prospect that many voters and observers may wear red-colored clothing to the polling place. Complt. ¶ 9. But Plaintiff conveniently omits the fact that supporters of its nominee for President are planning to wear coordinated clothing on election day, *see, e.g.*, Natalie Andrews, *Hillary Clinton Supporters Plan to Sport Pantsuits at the Polls*, The Wall Street Journal (Nov. 3, 2016). Neither pantsuits nor red Buckeye jerseys put voting rights at risk.

But even setting all of this aside, Plaintiff's claim also fails because Plaintiff offers no evidence that any of the defendants "intend[ed] to intimidate" individuals from voting. *Olagues*, 770 F.2d at 804. All Plaintiff could point to were vague comments warning that the election could be "stolen" if supporters did not monitor for fraud. On its face, this cannot possibly support a finding that the Campaign intended this to generate voter intimidation.

Plaintiff's Section 11(b) claim is thus unsupportable and unsupported.

**2.** Plaintiff's second claim fares no better. To prevail on a claim under Section 1985(3), a plaintiff must prove that "two or more persons [have] conspir[ed] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election." 42 U.S.C. § 1985(3). As with claims under Section 11(b), this claim is difficult to prove. Indeed, Plaintiff has not cited a *single case* in which a party has

prevailed under this provision even though it has been on the books for 145 years—since 1871.  Especially given the flimsy record and the eleventh-hour nature of the filings, nothing in this case warrants making it the first.

While Plaintiff has expended much time and ink detailing alleged statements and conduct by third parties, there is simply no factual sustenance for the notion that the Campaign has forged an agreement to intimidate or suppress Ohio voters. As detailed above, all of the statements Plaintiff cites as evidence of the Campaign's conspiratorial objectives, are in fact entirely innocuous.

"The essence of a conspiracy is a combination or agreement to violate or to disregard the law."  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1549 (9th Cir. 1989); *see* 15 Am. Jur. 2d Civil Rights § 153 (conspiracy "agreement and concerted action").  When, as here, a plaintiff merely delineates a constellation of independent acts by different persons acting at different times and in different places, courts will not infer the subjective unity of purpose necessary to a viable claim of civil conspiracy.  *See Weinstein v. Mortgage Capital Associates, Inc.*, 2:10-cv-01551-PMP, 2011 WL 90085, at *9 (D. Nev. Jan. 11, 2011) ("Plaintiff does not state when the conspiracy began or ended, the geographic scope of the conspiracy, what persons were involved, or any other facts supporting a meeting of the minds. Plaintiff does not allege facts which suggest Defendants would not have acted as they did absent a conspiracy.").  Rattling off a litany of alleged statements

and actions by various putative "Trump supporters" and other sundry third parties at various times in different locales simply does not, as a matter of law, establish a conspiracy by the Campaign to engage in voter suppression. Even isolated incidents of misconduct—if and to the extent they occur at all—do not constitute a "meeting of the minds" to violate voting rights. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) ("To prove a civil conspiracy, the plaintiff must show that the conspiring parties 'reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'").

More generally, this lawsuit encapsulates precisely the type of dispute that federal courts have long eschewed as political warfare through judicial means. Expressing skepticism of the notion that Section 1985(3) could encompass non-racial conspiracies, the Supreme Court cautioned that such a proposition "would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If [this] submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983). Mindful that "§ 1985(3) is not to be construed as a general federal tort law," *Sever v. Alaska*

*Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992), courts have consistently turned a jaundiced eye toward quintessentially political disputes between private parties cloaked in the lexicon of civil rights. *See Grimes v. Smith*, 776 F.2d 1359, 1366 (4th Cir. 1985) (holding that alleged private conspiracy to mislead voters by running a "sham" candidate was not actionable under Section 1985(3), reasoning that "this case presents a far greater danger that, in the words of *Scott,* § 1985(3) would provide 'a remedy for every concerted effort by one political group to nullify the influence of or do injury to a competing group by use of otherwise unlawful means'").

Accordingly, Plaintiff could not possibly have shown a likelihood of success on this claim.

## C.  The Order was also an improper "obey the law" injunction.

Even apart from the merits of Plaintiff's *claims*, the court's order is indefensible for another reason.  To the extent the district court *intended* the Order only to prohibit conduct that violates Ohio law—as explained below, it goes beyond that in violation of the First Amendment—the Order would merely direct the Campaign and others to "obey the law."

"Injunctions that broadly order the enjoined party simply to obey the law and not violate the statute are generally impermissible."  *N.L.R.B. v. U.S. Postal Serv.*, 486 F.3d 683, 691 (10th Cir. 2007); *see also E.E.O.C. v. Wooster Brush Co.*

*Employees Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) (explaining that "'obey the law' injunctions cannot be sustained.") (citation omitted).  That is so because such injunctions "often lack the specificity required by Rule 65(d)."  *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012); *see* Fed. R. Civ. P. 65(d) (requiring that every temporary restraining order and injunction "state its terms specifically"). That "Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt cita-tion on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).  Temporary restraining orders should thus "be phrased in terms of ob-jective actions, not legal conclusions." *Goble*, 682 F.3d at 950 (internal quotation marks omitted).

The Order below disregarded these hornbook principles.  It enjoins individu-als from "engaging in voter intimidation activity," Order at 3, which Ohio law al-ready prohibits, *see* Ohio Rev. Code 3599.01(A)(2) ("No person shall . . . [a]ttempt by intimidation, coercion, or other unlawful means to induct such delegate or elec-tor . . . to vote or refrain from voting . . ."). The district court concluded that its or-der was nonetheless permissible because rather than being "a broad and indefinite injunctive order, the Court orders compliance with specific provisions of the Ohio Revised Code . . . ." Order at 2.  In other words, after acknowledging its Order

merely "orders compliance" with Ohio law, the court then excused itself from the grasp of the controlling precedent forbidding such orders.

Whether the Order identifies "specific provisions"—in fact, it fails to identify those specific code sections—nonetheless cannot salvage it. For one thing, it is inappropriate for the court to essentially federalize Ohio election law by means of a restraining order. *See United States v. Toviave*, 761 F.3d 623, 627 (6th Cir. 2014) ("The harm is the federalization of state law. . . . [T]he Supreme Court has shied away from reading criminal statutes as making 'traditionally local criminal conduct . . . a matter for federal enforcement.'" (quoting *Jones v. United States*, 529 U.S. 848, 858 (2000))). Ohio voter intimidation laws carry their own penalties enforceable in state courts. *See, e.g.*, Ohio Rev. Code 3599.01(B) (making it a fourth degree felony to intimidate a voter). The Order serves no purpose other than to usurp state court jurisdiction to enforce Ohio laws.

Moreover, the Order adopts vague legal terms from Ohio statutes and thus fails to "describe in reasonable detail . . . the act or acts sought to be restrained . . . ." *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (quoting Fed. R. Civ. P. 65(d)) (holding injunction prohibiting "discriminating on the basis of color, race, or sex in employment practices" was "too general," even though it was "more specific than Title VII itself," and thus constituted an improper "'obey the law'" injunction"). The Order generally prohibits "engaging in voter intimidation activi-

ty," but does not define the legal term "intimidation." Order at 3. Indeed, while it identifies certain somewhat more specific acts—which likewise use overly general terminology like "[h]indering or delaying" and "[i]nterrogating, admonishing, interfering with, or verbally harassing"—it affirmatively states those acts are not the only enjoined acts of "voter intimidation activity." Order at 3 ("including but not limited to"). Such an order fails to inform those subject to it—including, here, many non-parties—precisely what they are enjoined from doing other than violating Ohio law. This is an independent basis for concluding that the Campaign is likely to prevail on the merits.

## II.  The Campaign Faces Irreparable Harm.

While the baselessness of the district court's order (and thus *the Campaign's* likelihood of success on the merits) alone justifies a stay here, the second factor—irreparable harm to the Campaign—reinforces this conclusion.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Such a loss is particularly egregious where the abridgment comes on the eve of Election Day. *See id.* at 389 ("The timeliness of political speech is particularly important."); *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) ("When, as here, a party seeks to engage in political speech in an impending election, a delay of even a day or two may be intolerable."). Under

such circumstances, a party seeking a stay need only identify a "colorable" First Amendment claim to "establish irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal quotation marks omitted).

Here, the district court's order broadly prohibits the Campaign (along with every person in Ohio) from "engaging in voter intimidation activity." The order does not exhaustively define what this entails, but it is clear it includes plenty of conduct protected under the First Amendment.

Consider the order's prohibition on "stating to individuals" near or around polling places that "voter fraud is a crime, or describing the penalties under any Ohio or Federal statute for impermissibly casting a ballot." As worded, this reaches abundant truthful, non-threatening speech. Plainly, this prohibition is unconstitutional. *See Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office."); *E. Connect-icut Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1051 (2d Cir. 1983) ("The right to communicate freely with one's fellow citizens and with the government on issues of public importance is a cornerstone of our American polity.").

The Order also prohibits "taking photos of . . . voters . . . at or around a polling place . . . ." Order at 4. That broad prohibition, which does not appear in any

Ohio statute, would prohibit voters from taking photos of themselves or their friends outside a polling place after taking their part in American democracy. In addition to being legally-protected, such conduct plainly does not constitute voter intimidation.

To take one more example, the Order prohibits "[h]indering or delaying a voter or prospective voter from reaching or leaving the polling place." Order at 3. What constitutes "hindering or delaying" a voter? Does it include approaching voters about the election outside Ohio's 100 foot "buffer" zone? Passing out party candidate slate cards? Pamphleteering? Exit polling? Merely driving too slow on the road leading up to the polling place? Much of that activity is protected by the First Amendment. *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014) (internal quotation marks omitted) ("handing out leaflets in the advocacy of a polit-ically controversial viewpoint . . . is the essence of First Amendment expression"); *ABC*, 479 F. Supp. 2d at 741, 744 (holding exit polling "is a form of political speech" protected under the First Amendment). And none of it can reasonably constitute voter intimidation. Moreover, and notably, Ohio law is narrower in this regard, prohibiting only "*unduly* delay[ing] or hinder[ing]" a voter. Ohio Rev. Code 3599.26 (emphasis added).

Making matters worse, even if the order *could be* read more narrowly, the looming threat of contempt for violating such a capaciously worded order can still

"inhibit [a] speaker from making protected statements, thereby chilling a kind of speech that lies at the First Amendment's heart." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (internal quotation marks and alteration omitted). This risk alone justifies the entry of a stay.

### III. Neither Plaintiff Nor Anyone Else Will Be Harmed If The Order Is Stayed.

Because there is no evidence of intimidation or threats to Ohio voters—or even a likelihood of such intimidation or threats—there is little more to say about the third factor—harm to other parties. Plaintiff had weeks to show that its Complaint was anything other than a political stunt—to provide any evidence that the Campaign has done or will do anything unlawful to deter anyone from voting. Its inability to provide this evidence is proof that no such evidence exists, and thus that no one will be irreparably harmed if the district court's order here is stayed.

But even setting that aside, there is one more reason the equities cut against the Order entered below: on its own theory, the supposed conspiracy in this case has been underway (and quite public) since August. *See* Mot. for TRO at 3 (relying on a report from August 9); *id.* at 4 (relying on a report from August 13). Yet it waited to file until a week before the election, seemingly for no other reason than to waste the opposition's time and resources, maximize the newsworthiness of the filing, and confuse the Campaign's supporters just days before the election.

"When an election is 'imminen[t]' and when there is 'inadequate time to re-solve [ ] factual disputes' and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures." *Crookston*, 2016 WL 6311623, at *2 (quoting *Purcell v. Gonzalez,* 549 U.S. 1, 5–6 (2006) (per curiam)).  So too should they decline to grant an injunction that creates confusion regarding whether and to what degree one campaign may comply with those "es-tablished election procedures." *Id.*  After all, "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls," *Purcell*, 549 U.S. at 4–5, and that is true whether the party seeking relief is challenging an election law, or challenging someone's adherence to that law.

The presumption against last-minute Orders like the one entered below is especially strong "when a plaintiff has unreasonably delayed bringing his claim, as [Plaintiff] most assuredly has." *Crookston*, 2016 WL 6311623, at *2.  One of eq-uity's foundational maxims is: "Equity aids the vigilant, not those who slumber on their rights."  Pomeroy, 1 A TREATISE ON EQUITY JURISPRUDENCE § 418, at 572 (2d ed. 1892).  Plaintiff could have brought its fact- and evidence-free claims long ago.  That it slept on those rights is yet another reason to deny relief.

## IV. Granting A Stay Would Not Serve The Public Interest.

In addition to the First Amendment interests at stake in this appeal, there is another reason a stay would advance the public interest—it would put on hold an order that threatens to undermine trust in the judiciary.

This case is one of six coordinated attacks across the country that are clearly long-planned efforts to sow chaos in the Campaign's political efforts, while garnering maximum publicity for Plaintiff's unsubstantiated, extraordinarily inflammatory claims on the eve of the Presidential Election. Plaintiff should not be permitted to enlist the judiciary in that political crusade where, as here, Plaintiff has offered no evidence of any actual misconduct by the Campaign.

That is particularly true where, as here, Plaintiff effectively asked the district court to take sides on a hotly debated policy issue. Specifically, the Complaint is critical of those concerned with voter fraud and those who believe our political system is "rigged" to favor certain interests over others. In one form or another, these policy debates are long-running and legitimate. Defendants respectfully submit that whether those views are right or wrong is a political question that is not for the judiciary to decide. Indeed, a pervasive element of this lawsuit is the Plaintiff's attempt to use this Court as a forum for contesting the merits of public policy questions relating to voter fraud and irregularities, and to wield an injunction as a means of advancing their political position. Courts should be highly reluctant to

silence the debate without concrete and compelling evidence that doing so is necessary. (It is troubling enough that a major political party would seek to muzzle its opponents; the courts should not compound the problem by acting as muzzlers.) Here, no such evidence exists.

## **CONCLUSION**

For the foregoing reasons, this Court should stay the district court's order.

Dated:  November 5, 2016                    Respectfully submitted,


                                            */s/ Chad A. Readler*
                                            Chad A. Readler
                                            (Ohio Bar Registration No. 0068394)
                                            E-mail:  careadler@jonesday.com
                                            Jones Day
                                            325 John H. McConnell Blvd.
                                            Suite 600
                                            Columbus, Ohio  43215-2673
                                            Telephone:  614.469.3939
                                            Facsimile:  614.461.4198


                                            *Counsel for Donald J. Trump for President Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of November, 2016, I submitted to the Clerk of Courts and Deputy Clerk of Courts for the United States Court of Appeals for the Sixth Circuit this Emergency Motion For Stay via e-mail pursuant to instructions from the Clerk's Office for emergency filings, and further certify that opposing counsel was copied on that e-mail.

<u>s/ Chad A. Readler</u>
*Counsel for Donald J. Trump for President Inc.*